UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRANDON DESHAWN JOHNSON,

           Petitioner,                    Civil No. 2:11-cv-11134
                                                Honorable Patrick J. Duggan

v.

RAYMOND BOOKER,

           Respondent,

_____/

## OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY

      Brandon DeShawn Johnson ("Petitioner"), a Michigan prisoner confined at the Chippewa Correctional Facility in Kincheloe, Michigan, has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, with the assistance of counsel. Petitioner is challenging his April 17, 2006 conviction for first-degree felony murder in violation of Michigan Compiled Laws § 750.316 and possession of a firearm in the commission of a felony in violation of Michigan Compiled Laws § 750.227b. For the reasons that follow, the Court denies Petitioner's request for habeas relief and declines to issue a certificate of appealability.

### I. Factual and Procedural Background

      Petitioner was convicted of the above offenses following a jury trial in the

Circuit Court for Eaton County, Michigan.  His convictions arose from the murder of Antonio Weaver on October 5, 2005.

According to the evidence, Weaver was found dead in the apartment he shared with his girlfriend Sharonda Warren.  (4/11/06 Trial Tr. at 44.)  He had been shot in the back of the head.  (4/10/06 Trial Tr. at 177, 209.)  When police arrived at the scene, they found no evidence of a forced entry or signs of a struggle.  (*Id*. at 177, 181.)  Warren indicated that when she arrived at the apartment at around 9:00 p.m. on October 5, 2005, she found the front door unlocked and discovered Weaver's dead body.  (4/11/06 Trial Tr. at 42-44.)

When the officers processed the apartment for evidence, they found a nine millimeter luger shell casing on the floor near Weaver's body.  (4/10/06 Trial Tr. at 198-99.)  The officers did not find any weapons, drugs, or cash in the apartment or on Weaver's person.  (*Id*. at 193, 200.)

Weaver began living with Warren in July 2005.  (4/11/06 Trial Tr. at 7.) According to Warren, Weaver drove a brown, four-door Buick Electra automobile and he sold heroin for a living.  (*Id*. at 9-10, 11.)  He possessed a Ruger nine-millimeter handgun, which he purchased a month before his murder.  (*Id*. at 15.) Warren testified that Weaver kept his heroin supply in the apartment freezer when he was not conducting a sale and the cash he earned from his sales in his pockets or

2

in shoeboxes in the apartment. (*Id*. at 12.) He had two cell phones– one with a 616-area code and the other with a 517-area code. (*Id*. at 13.) Warren testified that Weaver had a large amount of money in his possession the night before he was murdered, which he had won in a dice game. (*Id*. at 23, 25.)

Warren testified that Weaver brought Petitioner from Detroit to Lansing in late September 2005, to help with drug sales. (*Id*. at 17.) Weaver introduced Petitioner to Warren as his cousin. (*Id*.) Petitioner stayed at Warren's apartment or at a motel when he was in Lansing. (*Id*.) Weaver provided Petitioner with money, clothes, the 517-area code cell phone, and drugs. (*Id*. at 18.) According to Warren, the night before Weaver's murder, Weaver gave Petitioner his 9 mm Ruger handgun for protection. (4/11/06 Trial Tr. at 20.) Warren saw Petitioner return the gun to Weaver the next day. (*Id*. at 21.)

According to Akia Embry, who dated Weaver for three years prior to his murder, Petitioner and Weaver went to West Virginia together in early 2005, where they had a falling out. (4/11/06 Trial Tr. at 80.) Apparently West Virginia police stopped Petitioner and Weaver and a gun was found in the car, resulting in Petitioner being arrested and incarcerated. (*Id*. at 80-81.) Embry provided that Petitioner had been angry with Weaver because Weaver refused to "take the gun charge" and that Petitioner told Embry during a telephone call from jail that he was

3

going to "get" Weaver.  (*Id*. at 81-82.)

Eric Gibson, a friend of Weaver and Petitioner, testified that he was present when Petitioner and Weaver got into an argument concerning Defendant's arrest in West Virginia.  (4/11/06 Trial Tr. at 127.)  Gibson stated that Weaver pulled a gun on Petitioner during the argument, at which time Gibson intervened.  (*Id*. at 128.)

On the morning of October 5, 2005, Warren left the apartment for work before seven o'clock.  (4/11/06 Trial Tr. at 27-28.)  Before she left, Warren saw Weaver's heroin in the freezer, in its usual location.  (*Id*. at 27.)  Warren spoke with Weaver on three separate occasions throughout the morning, with the last call being at around 11:00 a.m.  (*Id*. at 29.)  She was not able to reach Weaver after that last phone call, but received five or six calls from Petitioner later in the day asking if she had seen him.  (*Id*. at 35.)  Embry also received a called from Petitioner during the afternoon of October 5, 2005, asking if she had seen Weaver.  (*Id*. at 98.)

James Vlahakis testified that at 9:30 a.m. on October 5, 2005, he and a friend went to the apartment complex where Weaver and Warren lived to purchase heroin from Weaver.  (4/11/06 Trial Tr. at 187.)  When Vlahakis and his friend arrived, Weaver was exiting his Buick Electra.  (*Id*. at 188.)  According to Vlahakis, a black male with medium skin and braids in his hair was with Weaver.  (*Id*. at 189.)

4

Vlahakis identified the individual as Petitioner, who Vlahakis said he had seen with Weaver before on three to five occasions. (*Id.* at 190-91.) Vlahakis testified that Petitioner was in the Buick Electra but eventually got out and walked toward the apartment building. (*Id.* at 188-89.) After the drug transaction was completed, Vlahakis and his friend left. (*Id.* at 193.)

Iesha Adams, a friend of Weaver, testified that Weaver came to talk to her at the Burger King where she worked at around 9:30 a.m. on October 5, 2005. (4/11/06 Trial Tr. at 65.) Adams indicated that Weaver was driving his brown Buick and that there was a passenger in the car, a black man with braids in his hair, who she could not identify. (*Id.* at 67.) Adams spoke with Weaver an hour later by phone. (*Id.* at 68.) She tried to reach him again repeatedly throughout the day, without success. (*Id.*)

According to Petitioner, he drove from Lansing to Detroit sometime before 1:30 p.m. on October 5, 2005. (4/14/06 Trial Tr. at 123.) Deone Rawls testified at trial that at around that time, he was in Detroit when he saw Petitioner driving in a brown Buick which had a "for sale" sign in it. (4/11/06 Trial Tr. at 120.) Rawls flagged down Petitioner and bought the Buick from Petitioner in exchange for five hundred dollars and Rawls' Blue Chrysler Fifth Avenue. (*Id.*)

On October 6, 2005, Officers Jason Schneider and Mark Wood of the

5

Southfield Police Department stopped Petitioner in the Blue Chrysler Fifth Avenue for driving with a fraudulent temporary tag in the rear window. (4/11/06 Trial Tr. at 200.) Petitioner appeared very nervous to the officers and he told them that he did not have any identification on him. (*Id*. at 201, 216.) The officers placed Petitioner in the back of their police vehicle while they ran his information. (*Id*.) While they did so, the officers asked Petitioner who owned the vehicle and Petitioner said that he did. (*Id*. at 215.) Petitioner also told the officers that he did not have a key to the trunk of the car. (*Id*.)

When they ran Petitioner's information, Officers Wood and Schneider learned that Petitioner's driver's license was suspended and they therefore placed him under arrest. (*Id*.) According to Officer Schneider, after being placed under arrest, Petitioner began to cry and begged to be let go. (*Id*. at 202.) Petitioner also attempted to get out of the police car and became more and more argumentative, eventually resulting in backup officers being called and Petitioner being pepper sprayed and handcuffed. (*Id*. at 203-04.)

After securing Petitioner, Officer Schneider called a tow truck to impound the Blue Chrysler Fifth Avenue. (*Id*. at 204.) Officer Schneider explained that their standard practice is to impound a vehicle when taking the driver into custody and where the ownership of the vehicle is unknown, in order to protect the owner

6

of the vehicle.  (*Id*. at 205.)  When a vehicle is impounded, the standard procedure is to search the vehicle and make a list of its contents on a vehicle impound sheet. (*Id*. at 220.)  During their search of Petitioner's vehicle, the officers used a key on the ring in the ignition to open the trunk of the vehicle.  There, they found a loaded 9 mm Ruger handgun inside a bookbag.  (*Id*. at 222-23, 229.)

Southfield Police Detective Timothy Gougen interviewed Petitioner when he arrived at the Oakland County jail.  Petitioner told Gougen that the car was not his and he did not know that there was a gun in the trunk.  (4/12/06 Trial Tr. at 37.) Petitioner indicated that perhaps some other person put the gun in the bookbag. (*Id*.)  He claimed that his fingerprints would not be on the gun.  (*Id*. at 38.)

Fingerprint experts from the Southfield Police Department's crime laboratory subsequently found a latent print on the trigger of the 9 mm Ruger handgun that matched Petitioner's right index finger.  (*Id*. at 50-54, 66-71.) Detective Sergeant Reinhard Pope, a firearms examiner with the Michigan State Police, subsequently tested the handgun, as well as the shell casing recovered from the apartment where Weaver was found dead and bullet fragments and a bullet jacket retrieved from Weaver's skull during his autopsy.  (4/12/06 Trial Tr. at 8-13.) He concluded that the bullet jacket and shell casing had been fired from the handgun found in the vehicle Petitioner was driving on October 6, 2005 when he

7

was stopped by Southfield Police Department officers.  (*Id*. at 13.)

On October 11, 2005, City of Lansing Police Department Detectives Bruce Holliday and Cathy Farrell interviewed Petitioner about Weaver's murder. (4/12/06 Trial Tr. at 130-31.)  Detective Holliday began by advising Petitioner of his *Miranda* rights.  (*Id*. at 131.)  During the ensuing interview, Petitioner claimed to have no knowledge of Weaver's murder and stated the gun found in the Chrysler Fifth Avenue he was driving on October 6 belonged to his girfriend.  Petitioner said he bought the gun for his girlfriend for protection because she just joined a cult.  Petitioner told the detectives that he believed his fingerprints would be on the gun because he had shown his girlfriend how to shoot it.  He also told the police that he had left Weaver's Buick Electra on a street in Detroit.

At the time of this interview, the detectives did not have positive proof that the 9 mm Ruger found in Petitioner's possession on October 6 was the gun used to kill Weaver.  During the interview, however, they gave Petitioner several opportunities to explain how he may have been in possession of the gun used to kill Weaver.  Petitioner repeatedly stated it was not the murder weapon.

The detectives interviewed Petitioner a second time on October 14, 2005. After advising Petitioner again of his *Miranda* rights, the detectives informed Petitioner that his fingerprints were found on the trigger of the 9 mm Ruger and

8

that the handgun was found to have been the gun used to kill Weaver.  (4/14/06 Trial Tr. at 6-7, 9.)  According to Detective Holliday, Petitioner then broke eye contact with the detectives, looked down into his lap, and let out a very deep sigh. (*Id*. at 9.)  Petitioner then proceeded to tell the detectives about a person named "Big Bro" from whom he claimed he bought the 9 mm Ruger handgun the morning of Weaver's murder.

Petitioner explained that he had been with Weaver the morning of October 5, 2005, and then took Weaver's Buick Electra and drove alone around Lansing. Petitioner then returned to the apartment complex later in the morning to find Weaver.  According to Petitioner, when he arrived at the parking lot of the complex, he ran into a person who he knew only as "Big Bro," who waved him down.  "Big Bro" told Petitioner that Weaver was not at the apartment and offered to sell Petitioner a 9 mm handgun for $75.00.  Petitioner told the detectives that he bought the gun because he thought it was a great deal.  He then left to drive to Detroit.

While Petitioner was held at the Eaton County jail, he was housed with Daviel Allen and Cedric Green.  Allen and Green informed the detectives investigating Weaver's murder that Petitioner had admitted to them that he killed Weaver.  (4/14/06 Trial Tr. at 27-29, 44-46.)  Allen and Green testified for the

9

prosecution at Petitioner's trial.

Petitioner testified in his defense and denied killing Weaver.  (4/14/06 Trial Tr. at 143.)  He told the jury the same story concerning his whereabouts on October 5, 2005 and how he came into possession of the 9 mm Ruger that he told the Lansing detectives during their second interview of him.  (*Id*. at 117-127.)  He admitted at trial, however, that he sold Weaver's car to Rawls in Detroit.  (*Id*. at 126-27.)  When asked why he lied to the police about the car, Petitioner acknowledged that at that point he had learned that Weaver was dead and he knew that taking the car to Detroit and selling it "don't look good."  (*Id*. at 173.)  He explained that he initially lied to the police about the gun being his because he was on probation for a reckless use of a firearm conviction.  (*Id*. at 131-33.)

The jury found Petitioner guilty of first-degree felony murder and felony firearm, and the trial court subsequently sentenced Petitioner to life in prison without parole and imprisonment for two years on the respective convictions. Petitioner then filed a direct appeal, claiming that there was insufficient evidence to support his felony murder conviction.  The Michigan Court of Appeals affirmed Petitioner's conviction.  *People v. Johnson,* No. 273693 (Mich. Ct. App. Dec. 27, 2007) (unpublished opinion).  The Michigan Supreme Court denied Petitioner leave to appeal because it was not persuaded that the question presented warranted

10

its review. *People v. Johnson*, 481 Mich. 877, 748 N.W.2d 826 (2008).

Petitioner then filed a post-conviction motion for relief from judgment in the

trial court in which he asserted the following claims:

> •Ineffective assistance of trial counsel based on counsel's failure to
> object to an invalid search of the trunk, statements taken in violation
> of *Miranda*, evidence of other crimes, and introduction of taped phone
> calls;
>
> •Trial court error in failing to grant his motion for directed verdict;
> and,
>
> •Ineffective assistance of appellate counsel for failing to raise the
> errors on direct appeal.

The trial court denied Petitioner's motion on December 1, 2008. *People v.*

*Johnson,* No. 05-559-FC (Eaton Cnty. Cir. Ct. Dec. 1, 2008) (unpublished

opinion). The Michigan appellate courts denied Petitioner leave to appeal. *People*

*v. Johnson,* No. 295114 (Mich. Ct. App. Dec. 23, 2009), *lv. den.* 486 Mich. 1044,

783 N.W.2d 371 (2010). Petitioner then filed the pending habeas corpus petition

raising his ineffective assistance of trial and appellate counsel claims.

## II. Applicable Standard

Petitioner's habeas petition is subject to review pursuant to the Antiterrorism

and Effective Death Penalty Act of 1996 (the "AEDPA"). Pub. L. No. 104-132,

110 Stat. 1214. In order to grant relief, this Court must conclude that the Michigan

11

court's decision "with respect to any claim that was adjudicated on the merits in State court proceedings" was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[]" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).

The Supreme Court of the United States has elaborated upon the standards set forth in the two clauses contained in 28 U.S.C. § 2254(d)(1).  "A state-court decision is contrary to clearly established federal law if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent."  *Murphy v. Ohio*, 551 F.3d 485, 493-94 (6th Cir. 2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 405, 120 S. Ct. 1495, 1519 (2000) (alterations in original) (internal quotation marks omitted)).  Alternatively, "[i]f the state court identifies the correct governing legal principle . . . , habeas relief is available under the unreasonable application clause if the state court unreasonably applies that principle to the facts of the prisoner's case or unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent

12

to a new context." *Akins v. Easterling*, 648 F.3d 380, 385 (6th Cir. 2011) (internal quotation marks and alterations omitted); *Williams*, 529 U.S. at 409, 120 S. Ct. at 1521.

A federal court may not find a state court's application of Supreme Court precedent unreasonable if it is merely "incorrect or erroneous. [Rather, t]he state court's application must have been 'objectively unreasonable.'" *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 520-21, 123 S. Ct. 2527, 2535 (2003) (citations omitted). As suggested by the above-quoted language, AEDPA's standard of review is "difficult to meet . . . [as it is a] highly deferential standard." *Cullen v. Pinholster*, 563 U.S. – , 131 S. Ct. 1388, 1398 (2011); *Renico v. Lett*, 559 U.S. 766, 773, 130 S. Ct. 1855, 1862 (2010) ("AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'") (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059, 2067 (1997) and *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S. Ct. 357, 360 (2002) (per curiam)). In fact, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. – , 131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S. Ct. 2140, 2150 (2004) (per curiam)). Principles of federalism,

13

comity, and parity between the state and federal court systems animate this

deference: as the Supreme Court has explained, "a federal court's collateral review

of a state-court decision must be consistent with the respect due state courts in our

federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041

(2003). Indeed, a "readiness to attribute error [to a state court's decision] is

inconsistent with the presumption that state courts know and follow the law."

*Woodford,* 537 U.S. at 24, 123 S. Ct. at 360. "Section 2254(d) reflects the view

that habeas corpus is a 'guard against extreme malfunctions in the state criminal

justice systems,' not a substitute for ordinary error correction through appeal."

*Harrington*, 131 S. Ct. at 786 (quoting *Jackson v. Virginia,* 443 U.S. 307, 332 n.5,

99 S. Ct. 2781, 2796 n.5 (1979) (Stevens, J., concurring in judgment)).

    Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not

completely bar federal courts from relitigating claims that have previously been

rejected in the state courts, it preserves the authority for a federal court to grant

habeas relief only "in cases where there is no possibility fairminded jurists could

disagree that the state court's decision conflicts with" Supreme Court precedent.

*Harrington*, 131 S. Ct. at 786. Therefore, in order to obtain habeas relief in federal

court, a state prisoner is required to show that the state court's rejection of his

claim "was so lacking in justification that there was an error well understood and

14

comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786-87.

### III.  Applicable Law and Analysis

Petitioner asserts ineffective assistance of trial and appellate counsel as grounds for his entitlement to the writ of habeas corpus.  He first raised these claims in his post-conviction motion for relief from judgment.  Petitioner alleges that his trial counsel was ineffective based on his failure to: (1) file a pre-trial motion to suppress the gun recovered from the trunk of his car; (2) move for the suppression of the statements taken by Lansing police on October 11, 2005; (3) move for the suppression of Petitioner's prior bad acts and criminal history; and (4) object to the admission of telephone calls Petitioner made from the Oakland County jail to his mother and girlfriend because the prosecutor failed to lay a proper foundation for their admission.  Petitioner contends that his appellate counsel was ineffective for failing to challenge the admission of this evidence on direct appeal.

To establish ineffective assistance of counsel, a petitioner must show, first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the petitioner.  *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2053, 2064 (1984).  A petitioner may show that counsel's

15

performance was deficient by establishing that counsel performed "outside the wide range of professionally competent assistance."  *Id*. at 689, 104 S. Ct. at 2066. This "requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id*. at 687, 104 S. Ct. at 2064.

To satisfy the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id*. at 694, 104 S. Ct. at 2068. A court's review of counsel's performance must be "highly deferential."  *Id*. at 689, 104 S. Ct. at 2065.  Habeas relief may be granted only if the state-court decision unreasonably applied Strickland's standard for evaluating ineffective assistance of counsel claims.  *Knowles v. Mirzayance*, 556 U.S. 111, 122-23, 129 S. Ct. 1411, 1419-20 (2009).  "The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable– a substantially higher threshold." *Id*. at 123, 129 S. Ct. at 1420 (internal quotation omitted).

## A.  The Handgun

Petitioner contends that his trial counsel should have moved to suppress the

16

handgun recovered from the trunk of Petitioner's vehicle because Petitioner did not

consent to the search and the police had not obtained a warrant to conduct the

search.  The trial court rejected this claim on post-conviction review on the ground

that the police seized the handgun after conducting a valid inventory search which

came within an exception to the search warrant requirement.  *Johnson,* No. 05-

559-FC, Slip. Op. at * 2.  Because the search was valid, the trial court concluded

that Petitioner's counsel was not ineffective for failing to challenge the search.  *Id.*

The state court's decision was neither contrary to, nor involved an unreasonable

application of, clearly established Federal law and it was not based on an

unreasonable determination of the facts in light of the evidence presented.

　　To demonstrate trial counsel's ineffectiveness based on his failure to litigate

a Fourth Amendment claim, Petitioner must show that his Fourth Amendment

claim is meritorious and that there is a reasonable probability that the verdict

would have been different absent the excludable evidence.  *Kimmelman v.*

*Morrison*, 477 U.S. 365, 375, 106 S. Ct. 2574, 2583 (1986).  Petitioner's Fourth

Amendment claim lacks merit because inventory searches are considered an

exception to the Fourth Amendment's warrant requirement.  *See Colorado v.*

*Bertine,* 479 U.S. 367, 371, 107 S. Ct. 738, 741 (1987) ("inventory searches are

now a well-defined exception to the warrant requirement of the Fourth

17

Amendment"). As the Supreme Court provided in *Bertine*: "The policies behind the warrant requirement are not implicated in an inventory search, . . . nor is the related concept of probable cause[.]" *Id.* (internal citations omitted). An inventory search is considered "reasonable" under the Fourth Amendment provided there is no showing that the police acted in bad faith or for the sole purpose of an investigation and the officers exercised their discretion in performing the search according to standard criteria. *U.S. v. Hockenberry*, 730 F.3d 645, 658-59 (6th Cir. 2013); *see also Bertine*, 479 U.S. at 372-73, 107 S. Ct. at 741-42.

In Petitioner's case, Officers Schneider and Wood testified that they followed standard protocol when they impounded the car Petitioner was driving upon his arrest. (4/11/06 Trial Tr. at 205, 220.) Officer Schneider explained that whenever they arrest the driver of a vehicle and they are not certain of the vehicle's ownership– which was the case here, particularly in light of the fraudulent temporary tag that caused them to stop Petitioner– they impound the vehicle to protect the owner. (*Id.*) When the officers ran the Vehicle Identification Number, the registered owner was not Petitioner. (*Id*. at 206.)

Petitioner contends that there is conflicting testimony as to where the vehicle was searched and that this raises a question as to whether the vehicle was in fact lawfully impounded when the search took place. (ECF No. 1 Pg ID 23, *comparing*

18

4/11/06 Trial Tr. at 229 *with* 204, 221.)  Contrary to Petitioner's assertion,

however, the trial testimony does not reflect a conflict concerning where the

vehicle was searched.  The only testimony was that it was on the roadside.

Nevertheless, where the vehicle was searched has no bearing on whether the search

was lawful, as the officers present at the scene uniformly testified that they decided

to impound the vehicle, called for a tow truck, and *then* searched and inventoried

the contents of the vehicle.  (4/11/06 Trial Tr. at 204, 218, 229.)  Petitioner cites no

authority requiring that the inventory search be conducted in a particular location.

Petitioner therefore is not entitled to habeas relief based on his claim that

trial counsel should have moved to suppress evidence found during the impound

search.

### B.  Interrogation Statement

Petitioner next contends that his trial counsel was ineffective for failing to

move for the suppression of a statement that Petitioner claims was taken in

violation of his *Miranda* rights after he requested the assistance of counsel.  The

state trial court rejected Petitioner's claim, finding that Petitioner did not

equivocally invoke his right to the assistance of counsel.  The trial court referred to

the following colloquy that ensued after the detectives advised Petitioner of his

*Miranda* rights during their first interview of Petitioner:

19

Detective Holliday: So you understand each of your rights?

Brandon Johnson: Yes.

Detective Holliday: Are you willing to give up these rights and answer questions or make statements at this time?

Brandon Johnson: Ah, I really would like to have a lawyer present.

Detective Holliday: Okay.

Brandon Johnson: Because I know how serious this is.

Detective Holliday: Hm-hm.

Brandon Johnson: And I don't have anything to hide. I will talk to you guys.  You know, I'll tell you any and everything I know, you know. But, um, I just wondered what like what kind of questions would you like to ask me or anything?

Detective Holliday: Well you, for, for you to find that out though.

Brandon Johnson: I gotta answer these questions though on paper.

Detective Holliday: Pardon?

Brandon Johnson: You said I gotta, I gotta answer these questions on the paper.

Detective Holliday: No. Well no, no. You answered them [Miranda warnings].  But you just said you wanted a lawyer which means I can't ask, tell you what the questions are gonna be without a lawyer being present. Now do you wanna waive your right to a lawyer? You understand that at any time, you can change your mind and stop talking and stop answering questions. You can ask for that lawyer at that time, whatever. But because you're thinking about asking for a lawyer -.

Brandon Johnson: Well I understand that.

Detective Holliday: Alright. That, I, I don't, you're in control here guy.

Brandon Johnson: Right, alright, alright. I understand that. You can, um.

Detective Holliday: You're in control.

Brandon Johnson: -------, you can, you can.

Detective Holliday: You wanna waive your rights and talk to us right now?

Brandon Johnson: I can talk to you, yes.

Detective Holliday: Okay. So the answers yes?

Brandon Johnson: Yes.

*See People v. Johnson*, No. 05-559-FC, Slip Op. at *3-4. Again, the trial court's conclusion is neither contrary to, nor involved an unreasonable application of, clearly established Federal law and it was not based on an unreasonable determination of the facts in light of the evidence presented.

It is well-established that once an accused invokes his right to counsel during custodial interrogation, that interrogation must cease until counsel is made available or the accused initiates further conversation with the police. *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 1885 (1981). However, the

21

"[i]nvocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 2355 (1994) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S.Ct. 2204, 2209 (1991)).  The *Davis* Court advised that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, [Supreme Court] precedents do not require the cessation of questioning."  *Id*. (emphasis in original).  The suspect "must unambiguously request counsel." *Id*., 114 S. Ct. at 2355.

In the present case, the trial court judge did not unreasonably apply clearly established federal law when finding that Petitioner failed to clearly and unequivocally invoke his right to counsel, because fairminded jurists could conclude that Petitioner's statements were not an unambiguous request to speak with counsel. Indeed, in *Davis,* the Supreme Court concluded that the defendant's statement "Maybe I should talk to a lawyer" was not an unequivocal request for counsel. *Davis,* 512 U.S. at 462, 114 S. Ct. at 2357; *see also, e.g., U.S. v. Amawi,* 695 F.3d 457, 485 (6th Cir. 2012); *cert. den.* – U.S. –, 133 S. Ct. 1474 (2013) (finding the defendant's statements during *Miranda* warning that "I'm going to

22

wait" and asking "is there a lawyer on board" were neither a clear nor unequivocal invocation of the right to remain silent or the right to counsel, as would warrant suppression of inculpatory statements subsequently made); *Cornelison v. Motley*, 395 F. App'x 268, 274 (6th Cir. 2010) (concluding that habeas petitioner's comment "What if I want my lawyer present first?" was too ambiguous to require the police to terminate their interrogation, particularly where the petitioner then proceeded to fill out the waiver form and indicated that he wished to speak with the police).

Moreover, once Petitioner stated that he would like to have a lawyer present, the detectives did not ask any further questions until Petitioner went on to state that he would talk to them.  The detectives then asked Petitioner additional questions to clarify whether he was invoking his right to counsel.  When a suspect makes an ambiguous or equivocal statement about counsel, "it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." *Davis*, 512 U.S. at 461, 114 S. Ct. at 2356.  It was thus "entirely proper" for the detectives to continue questioning Petitioner for the sole purpose of determining whether he wished to consult with an attorney. *Id.* at 462, 114 S. Ct. at 2357.  Petitioner's subsequent statements indicated that he wanted to continue to speak with the police.

23

Petitioner therefore fails to establish that his statements to the police were obtained in violation of his constitutional rights.  In light of the foregoing, there was no reasonable probability that a motion to suppress those statements would have succeeded.  Petitioner thus was not denied effective assistance of counsel as a result of his trial counsel's failure to move for the suppression of the statements.

## C.  Prior Bad Acts and Criminal History

Petitioner next contends that his trial counsel was ineffective for failing to move for the suppression of Petitioner's prior bad acts and criminal history. Specifically, Petitioner contends that his prior convictions for gun related offenses should have been suppressed.  The state trial judge rejected Petitioner's claim, focusing on Akia Embry's testimony about a phone call with Petitioner during which he threatened to harm Weaver as a result of Petitioner taking the gun charge in West Virginia.  *Johnson*, No. 05-559-FC, Slip Op. at *5.  The trial judge found the evidence admissible to establish Petitioner's motive for committing the murder, because it showed that Petitioner had threatened the victim and was angry with him for not taking responsibility for the prior gun charge.  *Id*.  The court therefore concluded that Petitioner's trial counsel was not ineffective for failing to object to its admission.  *Id*.

To the extent Petitioner claims that the trial court's decision violated

24

Michigan law or the Michigan Rules of Evidence, his claim is not cognizable on federal habeas corpus review. The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court has explained, an inquiry as to whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480 (1991).  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id*. at 68, 112 S. Ct. at 480. "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43, 116 S. Ct. 2013 (1996) (additional citations omitted)).

The Supreme Court and Sixth Circuit have held that evidence of a defendant's prior bad acts which is relevant in the defendant's trial can be admitted without violating the defendant's due process rights.  *See Dowling v. United States*, 493 U.S. 342, 353-54, 110 S.Ct. 668,  (1990); *Bugh v. Mitchell*, 329 F.3d 496, 512

25

(6th Cir.2003); *Coleman v. Mitchell*, 268 F.3d 417, 439-40 (6th Cir.2001).  Here, the prosecution introduced evidence concerning Petitioner's arrest in West Virginia on a gun related charge to offer a motive for killing Weaver.  Evidence of any other gun related offense was presented to the jury through Petitioner's own direct testimony.  Petitioner brought up the fact that he was on probation for a gun related offense to explain why he was nervous when the Southfield police stopped him and lied about the ownership of the gun after it was found in his car.

For these reasons, the Court finds no error in trial counsel's failure to object to the admission of this evidence.

### D.  Telephone Calls

Petitioner lastly contends that his trial counsel was ineffective for failing to object to the admission of telephone calls made by Petitioner from the Oakland County jail to his mother and his girlfriend.  Petitioner argues that the prosecutor failed to lay a proper foundation for their admission.  Specifically, Petitioner argues that "[n]o witnesses were called to prove a chain of custody, nor were [sic] any inquiry made into whether the people on the phone were in fact who the [p]rosecution claimed them to be."  (ECF No. 1 at Pg ID 61-62.)  Applying state law regarding the authentication of evidence, the trial judge rejected Petitioner's claim.

Petitioner's argument concerning the authentication of the tape recordings concerns only alleged violations of Michigan law. There is no constitutional dimension to the argument. As such, Petitioner is not entitled to habeas relief based on this claim, either.

### E.  Appellate Counsel

Petitioner claims that his appellate counsel was ineffective for failing to raise the challenges to his convictions that he now asserts. The Sixth Amendment guarantees a defendant the right to the effective assistance of counsel on the first appeal by right. *Evitts v. Lucey*, 469 U.S. 387, 396-97, 105 S. Ct. 830, 836-37 (1985). Appellate counsel, however, does not have a constitutional duty to raise every nonfrivolous issue requested by a defendant. *See Jones v. Barnes*, 463 U.S. 745, 751, 103 S. Ct. 3308, 3312 (1983). The Court has rejected Petitioner's ineffective assistance of trial counsel claims because the challenges Petitioner asserts trial counsel should have raised lack merit. "[A]ppellate counsel cannot be found to be ineffective for 'failure to raise an issue that lacks merit.' " *Shaneberger v. Jones*, 615 F. 3d 448, 452 (6th Cir. 2010) (quoting *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)). Petitioner therefore is not entitled to habeas relief on his ineffective assistance of appellate counsel claim.

### III.  Conclusion and Certificate of Appealability

27

For the reasons stated, the Court concludes that Petitioner fails to demonstrate that he is entitled to the writ of habeas corpus pursuant to 28 U.S.C. § 2254.  There is no merit to his claims of ineffective assistance of trial or appellate counsel.

When a district court enters a final order adverse to a habeas petitioner, it must issue or deny a certificate of appealability.  Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.  "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Supreme Court has explained that when a district court denies a habeas petition on the merits of the claims presented, a certificate should issue only if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.  *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 1604 (2000).  For the reasons stated above, the Court finds that Petitioner fails to make a substantial showing of the denial of a constitutional right.  Therefore, the Court declines to issue a certificate of appealability.

Accordingly,

**IT IS ORDERED**,  that Petitioner's application for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **DENIED**;

28

**IT IS FURTHER ORDERED**, that the Court declines to issue Petitioner a

certificate of appealability.

DATED: February 18, 2014          s/PATRICK J. DUGGAN
                                  UNITED STATES DISTRICT JUDGE


Copies to:
Gerald M. Lorence, Esq.
William M. Worden, Esq.